**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

In re:                                  )
                                        )
    ALEXANDRIA PRIFTIS WEST    )    Case No. 11-15594-BFK
                                        )    Chapter 7
        Debtor              )

**MEMORANDUM OPINION**

This matter comes before the Court on the Motion (Docket No. 107) of Howard Demory, Charlotte Demory, Eric W. Custer and 3rd Time Trucking, LLC (collectively, the "Movants") for Relief from a Protective Order and to Compel Discovery, the Opposition (Docket No. 126) of KSPH, LLC, and Sabrina Holme (together, "KSPH"), and the Reply Memorandum (Docket No. 130) of the Movants. The Court has reviewed the papers and heard the arguments of counsel. In addition, the Court has conducted an *in camera* review of all of the documents produced by KSPH in response to the Rule 2004 Examination Order (Docket No. 80) allowing the discovery.

For the reasons stated below, the Court will: (a) find that there has not been a subject matter waiver of the attorney-client privilege by KSPH; (b) find that the Movants have not met the burden of showing that the crime-fraud exception to the attorney-client privilege applies in this case; and (c) order that the Confidentiality provisions of the Protective Order are lifted, as they pertain to KSPH Document Nos. KH 1000-1180, inclusive. The Protective Order's confidentiality requirements shall remain in place with respect to the balance of the documents produced by KSPH, specifically, KSPH Document Nos. KH 1181-1852, inclusive. Finally, the Court denies the Movants' request to lift the restrictions as to contact with the so-called Restricted Parties in the Protective Order (other than as to the existing clients of counsel for the Movants).

1

**Findings of Fact**

The Court makes the following findings of fact.

*A. The Procedural Posture.*

1. The Debtor filed a voluntary petition in bankruptcy on July 29, 2011. Mr. King was appointed the Chapter 7 Trustee.

2. The Trustee filed a Report of No Distribution on September 27, 2011. Docket No. 34.

3. The Debtor has not been discharged, owing to a series of Orders extending the time to object to her discharge, or to the dischargeability of debts, under 11 U.S.C. §§ 727 and 523, respectively.

4. The Movants are former clients of Ms. West, and are creditors in this bankruptcy case. They are also Plaintiffs in litigation pending in the State courts of West Virginia against the Debtor, Massachusetts Mutual Life Insurance Company (hereinafter, "MassMutual") and others, for allegedly wrongful acts that they claim were committed against them in connection with their 412i defined benefit pension plans and other, related insurance products and services.

5. On September 30, 2011, the Movants filed a Motion for a Rule 2004 examination of KSPH. Docket No. 37. KSPH objected to the Motion and moved for the entry of a Protective Order. Docket Nos. 43, 57, and 75.

6. The Court entered an Order allowing the Rule 2004 Examination of KSPH on December 5, 2011. Docket No. 80. The Court also entered a Consent Protective Order (hereinafter, the "Protective Order") on December 9, 2011. Docket No. 87.

7. On February 7, 2012, the Movants moved for relief from the confidentiality provisions of the Protective Order. Docket No. 112. In their Motion, the Movants requested that

2

the Court find that the attorney-client privilege had been waived by KSPH as to the entirety of the subject matter at issue – the Consulting Agreement, discussed below. The Movants further requested that the Court find that the crime-fraud exception to the attorney-client privilege applies here. KSPH opposed the Motion in all respects.

8. The Court heard the arguments of counsel on March 15, 2012. In addition, the Court has conducted an *in camera* review of all of the documents for which the Movants seek relief from the confidentiality provisions of the Protective Order. These documents are identified as KH 1000-1852.

   *B. The TPA Business and the KSPH-West Consulting Agreement.*

9. Prior to filing for bankruptcy, Ms. West either conducted business under the name West Pension Solutions ("WPS"), or conducted the WPS business through one of her affiliated entities.[1] WPS acted as a Third Party Administrator, or TPA, for a number of defined benefit pension plans.

10. In October 2010, Ms. West and Ms. Holme began discussions about the possible purchase of the WPS business by Ms. Holme's company, KSPH. Document No. KH 1004. On November 1, 2010, the parties exchanged a draft Stock Purchase Agreement. Document No. KH 1016. On November 3, 2010, KSPH raised the issue of prepaid fees for the 2010 work on the pension plans, which KSPH proposed to set off against the purchase price for the stock. Document No. KH 1015.

---

[1] The evidence was not clear as to WPS's incorporation. The Debtor appears to have had other, related businesses, notably West Financial Group, LLC and West Financial Group Pension Solutions, LLC, both of which were incorporated in the State of Maryland. *See* Docket No. 47, Exhibit 2, ¶¶ 3-5. The Complaint of the Movants in the West Virginia action alleges that WPS is a trade name for West Financial Group Pension Solutions, LLC. Docket No. 47, Exhibit 5, Introduction and ¶ 10.

11. In the meantime, on October 13, 2010, the former owner of the WPS business, H. Lawrence (Larry) Logan, filed suit in the Circuit Court of Montgomery County, Maryland, for a substantial sum of money representing the balance of the purchase price that was due from Ms. West for her purchase of the business from Mr. Logan. *See* Docket No. 47, p. 3. (Referencing Exhibit A, *Logan v. West Financial Group Pension Solutions, LLC, et al.* (Civil No. 339256-V) (hereinafter, the "Logan Lawsuit.")).

12. On November 15, 2010, Ms. West pleaded guilty in the U.S. District Court in Baltimore, MD, to fraud involving pension plans under her administration, a felony. Movants' Motion for Relief from Protective Order, Exh. 4. This caused her to be ineligible as a matter of law to further administer any pension plans. 29 U.S.C. § 1111. When, precisely, Ms. Holme or her counsel found out about Ms. West's felony conviction is a matter that is disputed between these parties.

13. The discussions appear to have moved from a merger of the two companies to a transition of a number of the WSP files to KSPH. On November 30, 2010, Ms. West suggested that roughly 50 plans could be transitioned to KSPH. Document Nos. KH 1022-1023. On December 3, 2010, Ms. West suggested "selling" KSPH five of the plans. Document No. KH 1021. By December 18, 2010, Ms. West stated that the "major issue is having the lawyers decide how I can give you the reigns [sic] of this company/plans, without involving you in any legal obligations." Document No. KH 1024.

14. On February 16, 2011, Ms. West suggested: "What if we transitioned all of the business to you right away and you folks agreed to pay me 50% of the revenue on this business for the next 3 years." Document No. KH 1030.

15. On February 22, 2011, Ms. West advised Ms. Holme that she had just heard from MassMutual, and that they had agreed to delay sending any "bad letters," by which she meant letters to the clients advising them that WPS could no longer act as a plan administrator. Document No. KH 1031. Ms. West reiterated on March 3, 2011, that her lawyer had been able to keep MassMutual from sending the letters, and that MassMutual was willing to hold off on sending the letters while the discussions proceeded with KSPH for the transition of the business. Document No. KH 1035.[2]

16. Ms. Holme continued to express some concern about potential liabilities if KSPH were to pick up the WPS plans. Document No. KH 1037.

17. On March 5, 2011, Ms. West sent out e-mails to her clients advising them that WSP would no longer continue to act as the Third Party Administrator (though she did not tell them of her criminal conviction). Document Nos. KH 1038-1051. Ms. West recommended to each of the clients that they transition their business to KSPH. *Id.*

18. In connection with the Logan Lawsuit, on May 27, 2011, the Circuit Court of Montgomery County appointed Mr. Zvi Guttman as a Receiver for WPS. Document No. KH 1107. Mr. Guttman's services as Receiver later were terminated by the Circuit Court, on Mr. Guttman's Motion, on August 9, 2011. Document Nos. KH 1107-1122. The appointment of the Receiver caused some confusion with Ms. West and the TPA clients as to who was responsible for filing important papers in connection with the pension plans.

19. On June 9, 2011, Ms. West was sentenced by the U.S. District Court to 5 years of probation, and a restitution obligation of $76,608.66. KSPH's Response in Opposition, Exhibit 14. Again, the parties dispute when Ms. Holme knew of the Ms. West's criminal conviction.

---

[2] MassMutual unquestionably knew of Ms. West's criminal conviction as of February 11, 2011. Movants' Motion for Relief from Protective Order, Exhibit 5, MM-CD-007250-007255.

20. On July 27, 2011, Ms. West advised Ms. Holme of her intent to file for bankruptcy. Document No. KH 1080. In her e-mail to Ms. Holme, Ms. West assured Ms. Holme that Larry Logan would not "come after her," i.e., would not attempt to impose liability against KSPH as the purchaser of the WPS pension plans. *Id.*

21. Ms. West filed a voluntary petition for bankruptcy on July 29, 2011.

22. On the same day, July 29, 2011, in response to an e-mail from Ms. West, Ms. Holme advised Ms. West that "I'm doing everything I can – see e-mail from our Attorney," and she forwarded to Ms. West an e-mail from C. Thomas Ebel (hereinafter, the "Ebel e-mail"), of the law firm of Sands Anderson, dated July 28, 2011. Document No. KH 1079.

23. The Ebel e-mail is stated in its entirety, as follows:

> Sabrina, it appears from her correspondence that Ms. West is planning to file bankruptcy tomorrow. If there some [sic] amount that you owe to her or plan to pay her, it would an [sic] asset of her bankruptcy estate. As she is fling [sic] bankruptcy, if you pay her anything pursuant to any kind of pre-petition agreement or arrangement you are at risk of having to pay it twice, as it should be paid to the bankruptcy trustee once she files. The only way you can pay her is to hire her as an employee or independent contractor and pay her for current services going forward. While I do not agree with Ms. West's "promise" that Larry is not going to come after you (as it is my experience that once the primary target files bankruptcy creditors start looking for other and deeper pockets), you now also have to be concerned about the bankruptcy trustee as a possible claimant. There very well may be merit to Ms. West's assessment that Larry is tiring of paying legal fees and that there may not be a substantial basis for a claim against you, but you do not want to take any action which would contribute to the merits of such a claim. Any further relationship with Ms. West and any funds paid to her have to be very carefully considered now that she is filing bankruptcy.

E-mail from Thomas C. Ebel, Sands Anderson Attorney, to Sabrina L. Holme (July 28, 2011, 17:25 EST) (Document No. KH 1079).

24. On August 23, 2011, Ms. Holme sent Ms. West a draft Consulting Agreement. In her e-mail, Ms. Holme requested that Ms. West review, sign, and return the agreement to her,

6

"along with an invoice for services rendered." Document No. KH 1091. At this point, the only thing that Ms. West had done for KSPH was terminate WPS's TPA service agreements and recommend that the clients use KSPH as the third party administrator for their pension plans.

25.   The initial draft of the Consulting Agreement provided that Ms. West would be "retained by KSPH to provide assistance in administering the TPA work on behalf of clients of KSPH." Document No. KH 1141, ¶ 2.02.

26.   However, on the same day that it was forwarded to her, Ms. West requested that Section 2.02 be amended. Document No. KH 1091. Ms. West explained that, "[b]ecause of the court developments I have dealt with, I can no longer administer plans but I can market or develop new business." *Id.*

27.   Ms. Holme immediately agreed to Ms. West's requested change to Section 2.02. On August 24, 2011, Ms. Holme forwarded Ms. West the final draft of the agreement, to which Ms. West agreed. Ms. Holme reminded Ms. West: "Haven't gotten an invoice yet…." Document No. KH 1096.

28.   The Consulting Agreement is dated as of August 24, 2011. Document No. KH 1147. Section 2.02, as revised, provides: "Consultant [West] is hereby retained by KSPH to provide assistance in administration, marketing and client development on behalf of KSPH." Document No. KH 1148.

29.   Although KSPH maintains that this was purely an agreement for marketing and consulting services, Ms. West never produced a marketing plan, and appears never to have provided KSPH with anything of value, other than the recommendations for the transition of the roughly 53 plans for which the clients entered into separate TPA Services Agreements with

7

KSPH. At the same time, Ms. West had no business card from KSPH, no marketing materials, and does not appear ever to have conducted any marketing on behalf of KSPH.

30. The first invoice from Ms. West to KSPH is dated August 24, 2011. Document No. KH 1158. It is for $10,000, reciting that she had spent 50 hours consulting, at $200 per hour. *Id.* The second invoice, dated September 8, 2011, is similarly for 50 hours, at $200 per hour, or $10,000. Document No. KH 1159. The third invoice is for $13,000, representing 65 hours at $200 per hour. Document No. KH 1160. The fourth and final invoice is dated October 31, 2011, and is for $17,600, representing 88 hours at $200 per hour. Document No. KH 1161.

31. KSPH paid all of the invoices except for the last one. There is no evidence that Ms. West actually spent any of the hours listed in the invoices on marketing activities for KSPH.

32. Roughly 53 clients entered into Third Party Administrator Service Agreements with KSPH. Document Nos. KH 1181 - 1852. The Movants were not among the TPA clients who entered into separate Third Party Administrator Service Agreements with KSPH. *Id*.

33. In a series of increasingly frantic e-mails and text messages in November and early December, Ms. West requested payment of her final invoice. Document Nos. KH 1124-1137. By December 5, 2011, Ms. Holme refused to speak with Ms. West any further. Document No. KH 1123. To date, KSPH has refused to pay.

## Conclusions of Law

The Motion raises three distinct legal issues: (1) whether there has been a subject matter waiver of the attorney-client privilege; (2) whether the Movants have met the burden of showing that the crime-fraud exception to the attorney-client privilege applies; and (3) whether the confidentiality restrictions in the Protective Order should be lifted. The Court will address each of these issues, in turn.

    *1.*     *The Issue of Subject Matter Waiver.*

"The attorney-client privilege is the oldest of the privileges . . . known to the common law.  Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).

The attorney-client privilege can be waived by a disclosure of otherwise protected communications between the attorney and the client to third parties.  There is "no requirement that the waiver . . . be intentional and knowing.  Rather, [a] . . . waiver may follow from inadvertent disclosures or from any conduct by the client that would make it unfair for him thereafter to assert the privilege." Edna Selan Epstein, *The Attorney-Client Privilege and Work Product Doctrine* 264-65 (4th ed. 2001).  One Judge from this District has noted:

> Courts in this area take almost a strict liability approach to third party disclosure. If the information ends up in the hands of a third party, courts don't want to hear how it got there. Once in the hands of a third party, the privilege, if it ever existed, is lost.

*FEC v. Christian Coalition*, 178 F.R.D. 61, 71-72 (E.D. Va. 1998).  Thus, there is no genuine dispute that the privilege was waived as to the Ebel e-mail.

The more difficult question, as advanced by the Movants, is whether there was a subject matter waiver as a result of the disclosure of the Ebel e-mail.  If so, this potentially would open up discovery as to Sands Anderson's entire file, and to the depositions of its attorneys, on the subject matter of the Ebel e-mail.  As a general proposition, the Fourth Circuit has embraced the concept of subject matter waiver. *See, e.g.*, *United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir. 1982); *Sheet Metal Workers Int'l Ass'n v. Sweeney,* 29 F.3d 120, 125 (4th Cir. 1994).  Subject matter waivers have generally been applied where a client is seeking some tactical advantage by

a partial waiver; where, for example, a client asserts the "advice of counsel" as a defense to a claim.  *See, e.g.*, *LifeNet, Inc. v. Musculoskeletal Transplant Foundation, Inc.*, 490 F.Supp.2d 681, 685 (E.D. Va. 2007) ("'Once a party announces that it will rely on advice of counsel . . . in response to an assertion of willful infringement, the attorney-client privilege is waived.  The widely applied standard for determining the scope of a waiver of attorney-client privilege is that the waiver applies to *all other communications relating to the same subject matter*'" (citing *In re EchoStar Comms. Corp.*, 448 F.3d 1294, 1299 (Fed. Cir. 2006) (emphasis in original *LifeNet* opinion)).

There is an important limitation on subject matter waivers, though.  In the *Christian Coalition* case, the Court described this limitation as follows:

> [T]he Fourth Circuit recognizes the concept of subject matter waiver; yet, subject matter waiver is appropriate only when the party seeking the privilege previously waived the attorney-client privilege to make some tactical use of the documentation. When the party simply relates the communication to a third person, and does not try to use the documentation to its advantage in litigation, then a court's finding subject matter waiver would be an error of law.

*FEC v. Christian Coalition*, 178 F.R.D. at 74. "[C]ourts apparently retain discretion not to impose full waiver as to all communications on the same subject matter where the client has merely disclosed a communication to a third party, as opposed to making some use of it." *United States v. Jones*, 696 F.2d 1069, 1072 (4th Circuit 1982) (citing *In re Sealed Case*, 676 F.2d 793, 809 n.54 (D.C. Cir. 1982)).  *See also* Edna Selan Epstein, *The Attorney-Client Privilege and Work Product Doctrine* 389-90 (4th ed. 2001) ("Recent decisions have made a discriminating analysis in determining the scope of waiver occasioned when a party discloses one of a series of communications. The Courts have looked to the use being made of the disclosed communications and the prejudice to the adversary of the partial disclosure").

The D.C. Circuit's opinion in *In re Sealed Case* was cited with approval by the Fourth Circuit in the cases of *United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir. 1982), and *Sheet Metal Workers Int'l Ass'n v. Sweeney,* 29 F.3d 120, 125-26 (4th Cir. 1994). In *U.S. v. Jones*, the Fourth Circuit stated:

> Any voluntary disclosure by the client to a third party waives the privilege not only as to the specific communication disclosed, but often as to all other communications relating to the same subject matter. *In re Sealed Case,* 676 F.2d 793, 808-09 (D.C. Cir. 1982). In *Sealed,* the court stated that when a party reveals part of a privileged communication to gain an advantage in litigation, the party waives the attorney-client privilege as to all other communications relating to the same subject matter. Selective disclosure for tactical purposes waives the privilege. *Id.* at 818.

696 F.2d, at 1072.

Here, the Court cannot say that the Ebel e-mail was put to any tactical use by Ms. West. Ms. West was simply trying to move the negotiations along, and she forwarded her attorney's e-mail to Ms. Holme in an effort to do so. This is not a tactical use of the Ebel e-mail, such that it would make it unfair not to compel the disclosure of the rest of the attorney-client privileged materials in Sands Anderson's file.

The Court finds that, although there has been a waiver as to the Ebel e-mail, there has not been a subject matter waiver in this case.

    2.    *The Crime-Fraud Exception to the Attorney-Client Privilege.*

The Fourth Circuit has described the contours of the crime-fraud exception to the attorney-client privilege as follows:

> [U]nder the crime-fraud exception to the attorney-client privilege, "when a client gives information to an attorney for the purpose of committing or furthering a crime or fraud," the privilege is lost. *United States v. Under Seal,* 102 F.3d 748, 750–51 (4th Cir. 1996) (citing *In re Grand Jury Subpoena*, 884 F.2d 124, 127 (4th Cir. 1989)). For the crime-fraud exception to apply, "it is enough that the communication furthered, or was intended by the client to further . . . illegality."

11

> *In re Grand Jury Proceedings # 5*, 401 F.3d at 251. The burden is on the party asserting the crime-fraud exception, here the Government, to make a prima facie showing that the exception applies. *Id.*; *see also In re Grand Jury Proceedings*, 33 F.3d 342, 348 (4th Cir. 1994).
>
> The invocation of the crime-fraud exception requires a prima facie showing that "(1) the client was engaged in or planning a criminal or fraudulent scheme when he sought the advice of counsel to further the scheme, and (2) the documents containing the privileged materials bear a close relationship to the client's existing or future scheme to commit a crime or fraud." *In re Grand Jury Proceedings # 5*, 401 F.3d at 251 (citations omitted). A party invoking the crime-fraud exception can satisfy the first prong of this test by making a prima facie showing of evidence, which, if accepted by the trier of fact, establishes the elements of an ongoing or prospective violation of the law. *Id.* The second prong of this test is satisfied with a showing of a close relationship between the withheld communications and the alleged violation. *Id.* Once a sufficient showing has been made, the attorney-client privilege ceases to protect any of the communications related to the alleged violation. *In re Grand Jury Subpoena,* 419 F.3d 329, 345 (5th Cir. 2005) (citing *In re Sealed Case*, 676 F.2d 793, 812 n.74 (D.C. Cir. 1982)).

*United States v. Under Seal (In re Grand Jury Investigation)*, 352 Fed.Appx. 805, 807-808 (4th Cir. 2009). *See also U.S. ex rel. Frascella v. Oracle Corp.*, No. 1:07cv529 (LMB/TRJ), 2011 WL 2636838, at *1 (E.D. Va. July 6, 2011) ("[T]he crime/fraud exception to the attorney-client privilege applies upon a *prima facie* showing '1) that defendant was engaged in or planning a criminal or fraudulent scheme and used his counsel to further the scheme, and 2) that the privileged information bears a close relationship to the criminal or fraudulent scheme'" (quoting *In re Galaxy Computer Servs., Inc.,* No. 1:04–cv–00007, 2004 WL 3661433, at *3 (E.D. Va. March 31, 2004))); *Riggs Nat'l Bank v. Andrews (In re Andrews)*, 186 B.R. 219 (Bankr. E.D. Va. 1995).

The Movants first assert that a crime has been committed, specifically, a violation of 29 U.S.C. § 1111, which generally prohibits one convicted of a fraud, grand larceny or other identified crimes: (1) from serving as an administrator, fiduciary agent, employee or

representative "in any capacity" of any employee benefit plan; (2) from acting "as a consultant or adviser to an employee benefit plan, including but not limited to any entity whose activities are in whole or substantial part devoted to providing goods or services to any employee benefit plan;" and (3) from acting in any capacity "that involves decision making authority or custody or control" of the money or assets of any employee benefit plan. 29 U.S.C. § 1111(a)(1) – (3). The Movants, however, do not stand in the shoes of the government for purposes of prosecuting either Ms. West or KSPH for any alleged violations of this statute.

Alternatively, the Movants assert that a fraud has been committed – that the TPA clients paid for services for the year 2010 that either were never performed, or, if they were performed, were performed by someone (Ms. West) who, as a convicted felon, was legally ineligible to do so. It is not entirely clear to the Court, though, who was hurt, and how. The allegations of a fraud perpetrated on the TPA clients are, in the Court's view, attenuated and vague. The Court is not aware of any of the TPA clients asserting that they were harmed by Ms. West's continued involvement with KSPH. It bears repeating here that none of the Movants are, in fact, KSPH clients. The Movants cannot claim that they were harmed by the continued involvement of Ms. West with the transferred TPA Service Agreements. The standing of the Movants to maintain any claims against KSPH is questionable, at best.

At the same time, it is possible that a trier of fact, if presented with a full evidentiary record, could conclude that the Consulting Agreement was not legitimate. Ms. West does not appear to have performed any meaningful marketing services. Rather, the payments made to her by KSPH appear more to be in the nature of payments for recommending the transition of the TPA Service Agreements to KSPH (without any disclosure to the clients of why she was exiting the third party administrator business). Again, who was defrauded and in what amounts is

unclear to the Court. It is possible that, if the true state of affairs were known to the bankruptcy Trustee, the Trustee could make a claim that the proceeds of the payments from KSPH to the Debtor were proceeds of pre-petition property of the estate. *See, e.g.*, *Beaman v. Shearin* (*In re Shearin)*, 224 F.3d 346 (4th Cir. 2000) (law partner's share of profits and capital account held to be property of the estate); *In re Andrews*, 80 F.3d 906 (4th Cir.1996) (post-petition payments made under a pre-petition non-competition agreement held to be property of the estate). Whether the Trustee would want to pursue such claims is a matter left to the Trustee's discretion, at least for now.

At bottom, though, assuming that there was some sort of impropriety, be it a crime or a fraud, the Court cannot see how Ms. West sought the advice of the Sands Anderson firm in furtherance of the scheme, nor can the Court conclude that the advice rendered bore a "close relationship" to the scheme. Mr. Ebel's e-mail cannot be said to have been in furtherance of a fraud or a crime. In fact, it represents sound bankruptcy advice, the kind that any good lawyer might be expected to provide a client when a client learns that her counterparty to an important business transaction has just filed for bankruptcy. This is hardly "'an extensively planned course of dealing to collude with a competitor and clandestinely transfer assets from the parent company, through transactions structured with the advice of counsel.'" *Galaxy Computer Servs., Inc. v. Baker*, 325 B.R. 544, 557 (E.D. Va. 2005) (quoting *Galaxy CSI, LLC v. Galaxy Computer Servs., Inc. (In re Galaxy Computer Servs., Inc.)*, No. 04-07-A, 2004 U.S. Dist. LEXIS 28162, at *6 (E.D. Va. Mar. 31, 2004)). Nor can Sands Anderson's advice be said to constitute the kind of direct, pre-fraudulent transfer advice from the law firm at issue in the *In re Andrews* case. Any advice that Sands Anderson gave cannot be said to be "closely connected" to the alleged crime or fraud.

For the foregoing reasons, the Court concludes that the Movants have not met their burden with respect to establishing the crime-fraud exception to the attorney-client privilege in this case.

*3.    The Confidentiality Restrictions of the Protective Order.*

The Movants further seek relief from the confidentiality restrictions set forth in the Protective Order. The Protective Order, by its terms, required that any designation of confidentiality be made in good faith. Docket No. 87, p. 4, ¶ 4. Upon receipt of the documents, the majority of which were stamped "Confidential" (by the estimate of both parties, roughly 80% of the documents produced), the Movants employed the procedures identified by Section 6 of the Protective Order for relief from its confidentiality restrictions. Document Docket No. 87, p. 5, ¶ 6.

As noted, the Court has conducted an *in camera* review of all of the documents at issue. The documents can be broken down, roughly, into two categories. First, the e-mails among Ms. West, Ms. Holme, MassMutual and the TPA clients regarding the potential sale of the business, the recommendations that the clients engage KSPH to act as their third party administrator, the Consulting Agreement, and the invoices and payments for the alleged "marketing and consulting" services. Document Nos. KH 1000-1180. The Court finds that, with respect to this first category of documents, the "Confidential" designations were not made in good faith. There is simply no justification to keep these documents confidential. KSPH protests that these documents include:

> marketing plans, growth strategy, business organization sources, plan service agreements, client and referral source information (not available to the public), pricing, communications with clients, bank account information and all other information falling squarely within the definition of "Restricted Information" in the Protective Order.

15

KSPH's Response in Opposition, p. 20.

Other than the actual TPA Service Agreements, though, none of these documents can be described as legitimately confidential. None of the documents identify a marketing plan or growth strategy. Conversely, as noted above, there was no marketing plan or growth strategy, at least none in which Ms. West appears to have participated. There is no pricing information in any of the documents. The bank account information (Document Nos. KH 1154-1157) can be dealt with by redacting the bank account identifiers, as both sides have agreed to do. There is nothing here that derives any value from being kept confidential, such as a trade secret. *See* Va. Code § 59.1-336 ("Trade Secret" defined as: "information, including but not limited to, a formula, pattern, compilation, program, device, method, technique, or process, that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy").

On the other hand, the Court finds that the second category of documents, comprising Document Nos. KH 1181-1852, are and shall remain confidential. With the exception of Document No. KH 1852, which identifies a number of the plans by name and displays their respective asset values, these documents are all TPA Service Agreements that KSPH entered into with its clients. For this second category of documents, both KSPH and the TPA clients have legitimate expectations of confidentiality. The originally proffered reason for the Rule 2004 examination, that the examination could "identify potential assets of the Debtor's estate, including potentially fraudulent transfers made by or through West or the West Entities," Motion

for Rule 2004 Examination, Docket No. 37, ¶ 5, is satisfied by the information disclosed, above. The release of the client TPA Service Agreements would not serve any useful purpose in identifying assets of the estate. As well, the investigation of any claims against the Debtor under Sections 727 or 523 of the Bankruptcy Code is not aided by the disclosure of these documents. These documents shall remain confidential pursuant to the terms of the Protective Order.

Finally, the Movants seek to contact KSPH's clients, which would otherwise be prohibited under the "Restricted Parties" provision of the Protective Order. Docket No. 87, pp. 5-6, ¶ 7. The Court will deny this request. First, if the Court were to lift the restrictions as to contact with the Restricted Parties, the continued confidentiality of the aforementioned second category of documents would be meaningless (the clients, of course, already have copies of their own TPA Service Agreements with KSPH). More importantly, the Court cannot see any need for contact with any of these TPA clients by the Movants and their counsel. KSHP has a legitimate interest in not having its clients contacted. The proffered reason from the Movants, that these TPA clients arguably might be creditors of the bankruptcy estate, carries virtually no weight – the Trustee has already filed a Report of No Distribution in the case. There would be no opportunity for these clients to file proofs of claim in the case; there is no distribution anticipated to any of the creditors in the case. There can be no legitimate claim that contact with KSPH's clients would (1) further the administration of this case, (2) assist in identifying assets that may have been allegedly fraudulently transferred, or (3) assist in identifying causes of action that might be brought against the Debtor under Sections 523 or 727 of the Code. The Court can

discern no legitimate need for contact with these clients. Accordingly, the request to lift the Restricted Parties provisions of the Confidentiality Order will be denied.[3]

## Conclusion

For the foregoing reasons, the Court will: (a) lift the confidentiality restrictions as to Document Nos. KH 1000-1180; (b) deny the Motion insofar as it seeks a finding of a subject matter waiver of the attorney-client privilege; (c) deny the Motion insofar as it seeks a finding that the crime-fraud exception applies; and (d) deny the Motion insofar as it seeks to lift the Restricted Parties restrictions in the Protective Order (other than as to counsel for the Movants' existing clients, for which the Restricted Parties restrictions will be lifted). A separate Order will issue.

Date: _____

                                              Brian F. Kenney
                                              United States Bankruptcy Judge

---

[3] The exception here will be counsel for the Movants' existing clients. In the Court's view, prohibiting counsel from contact with existing clients could unnecessarily interfere in already established attorney-client relationships.

Copies to:

Alexandria Priftis West
204 Donmore Drive
Great Falls, VA 22066
Debtor

Amir Raminpour, Esquire
Raminpour Lee, LLP
8500 Leesburg Pike, Suite 409
Vienna, VA 22182
Counsel for the Debtor

W. Ashley Burgess, Esquire,
Sands Anderson PC
1111 E. Main Street (23219)
P.O. Box 1998
Richmond, VA 23218
Counsel for Sabrina Holme and KSPH, LLC

Justin P. Fasano, Esquire
Whiteford, Taylor & Preston, LLP
3190 Fairview Park Drive, Suite 300
Falls Church, VA 22042
Counsel for Howard and Charlotte Demory, Eric W. Custer, and 3rd Time Trucking, LLC